**75**

HUNT, Insurance Com'r, v. FIDELITY &
DEPOSIT CO. OF MARYLAND.

No. 6235.

Circuit Court of Appeals, Third Circuit.

Sept. 10, 1937.

Rawle & Henderson, of Philadelphia, Pa., Maurice Stern, Sp. Dep. Atty. Gen., and Charles J. Margiotti, Atty. Gen. (Thomas F. Mount and Joseph W. Hen-derson, both of Philadelphia, Pa., of counsel), for appellant.

Frederick H. Knight and Francis B. Bracken, both of Philadelphia, Pa. (Morgan, Lewis & Bockius, of Philadelphia, Pa., of counsel), for appellee.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

DAVIS, Circuit Judge.

This is an appeal from a judgment of the District Court entered for the defendant on a point of law reserved, notwithstanding a verdict for the plaintiff.

This was a suit on an indemnity bond to recover from the defendant, surety company, for losses sustained by the Penn General Casualty Company, hereinafter called the Casualty Company, through the embezzlement of C. B. Love, its president, and H. C. O'Brien, its secretary and treasurer. The jury found that the Casualty Company had not suffered any loss through the conduct of O'Brien, but that it had suffered a loss through the embezzlement of Love. The District Court, however, decided as a matter of law that the Casualty Company had not given notice of the embezzlement of Love to the defendant within the time required by the indemnity bond and that, therefore, the plaintiff could not recover.

The issue here is whether or not the giving of notice under the facts in this case was a question of law for the court or a question of fact for the jury under proper instruction of the court.

The defendant issued to the Casualty Company a "fidelity schedule" bond wherein it agreed to indemnify that company against all direct losses sustained by it through "larceny, embezzlement, theft, forgery, misappropriation, wrongful abstraction, wilful misapplication, or any other act of fraud or dishonesty" of its employees named in the bond. Love and O'Brien were included in the coverage to the extent of $10,000 each.

The bond provided, as to the notice to be given in case of default or other dishonest act of any person covered by it, as follows: "First: The Employer shall notify the Surety by letter or telegram addressed and sent to it at its home office in the City of Baltimore, Maryland, of any default as aforesaid or of any other dishonest act on the part of any

person filling any position covered hereunder, as soon as reasonably possible and in any event within ten days after discovery thereof by the Employer, or, if the Employer be a corporation, by any officer thereof not in collusion with such person. Such notice shall set forth the name and address of the person causing such loss and the position filled by such person."

As bearing upon the discovery of the embezzlement and notice thereof to the defendant, the evidence shows that in the first week in September, 1933, J. V. Gosline, vice president of the company, received word from Love, who was then being held in Baltimore, in connection with attachment proceedings on his yacht, requesting him to obtain a bond in the sum of $55,000 for the release of the boat, to be secured by the company's collateral. Gosline refused to do this. Love then telephoned to E. J. Doyle, assistant treasurer of the company, and requested him to draw a check for $11,392.50 in the name of the company, countersign it, have it certified and sent to him, but Doyle, on the advice of Gosline, also refused.

The boat incident was the first thing that really aroused the suspicions of Gosline. On September 5, or 6, 1933, he was present at the semiannual audit of the company. At this audit Gosline learned that Love had sold securities belonging to the company and had used $225,000, received for them to purchase 5,000 shares of the preferred stock of the General International Corporation which is alleged to be worthless. He did not deliver this stock to the company until he was investigated in September. It was also discovered that Love had withdrawn $17,500 from the company on the representation that he was using it to settle for some securities which he had purchased for the company, but it was not so used and has not yet been returned. Gosline, however, knew before that Love had withdrawn the $17,500 but thought he was using it honestly for the company under the broad powers which had been given him. On September 9, 1933, he wrote and personally delivered a letter to the commissioner of insurance of the commonwealth, informing him of the boat incident and of all the above facts.

On the same day, September 9, 1933, he swore to an affidavit charging Love with embezzlement. A warrant was issued, but, upon obtaining legal advice that he did not have sufficient proof to substantiate his allegations, he withdrew the warrant.

As a result of his letter to the commissioner, an investigation into the activities of Love was commenced on September 11, 1933. At the investigation Love testified that the stock of the General International Corporation (of which he was president) was worth $225,000; that he was not aware that its purchase was not a legal investment; that he would substitute other securities; and that he still had the $17,500, for which he would account in a few days. He was thereupon given time to substitute other securities and to return or account for the $17,500. He continued as president of the company until November 9, 1933, when he was removed from office and a resolution was passed demanding that he return the $17,500. Love did not comply with the demand, and on November 14, 1933, proof of loss was filed with the defendant and a demand for the payment of $20,000, with interest, $10,000 each for Love and O'Brien.

On June 5, 1934, the Casualty Company began suit on the bond to recover the $20,000, with interest of $2,770, on the ground that Love and O'Brien had embezzled $242,500, but $20,000, with interest, was the most that could be recovered on the bond. The surety company defended on the ground that it had not been notified within the time required by the bond.

Owen B. Hunt was substituted as party plaintiff after the Casualty Company had been dissolved by order of the court of common pleas of Dauphin county, Pa.

Gosline testified at the trial that at or about the time he filed his letter with the commissioner on September 9, 1933, notifying him of Love's activities, he called on Mr. Barratt, with whom he, as representative of the Casualty Company, had transacted business with the defendant; that he told him that he was filing a letter with the insurance commissioner in the nature of a complaint that might lead "to involvement of their fidelity bond with us"; that Barratt suggested that he see Mr. Cox, their claim manager in Philadelphia; that he communicated with Cox and went over the case several times with him; that he told him of the examination of the company's affairs by the Insurance Department, and the progress of that examination as near as he knew it; that he told

Cox that the Casualty Company wanted to comply with the conditions of their bond in every respect and suggested that Cox give him any forms of notice that they required and any further information that they might want; that "he gave me these proofs of claims and told me that would be sufficient, and I filed them that way"; and that up until November 9, 1933, matters were too confused to determine whether the actions of Love were really honest or dishonest.

At the conclusion of the trial, the court charged the jury, among other things, as follows: "It (the bond) says * * * when the party guilty of the fraud is himself a responsible officer of the Company, then the notice is not required to be given until some officer not in collusion with the defaulting officers had knowledge of it. So, of course, you will direct your attention to that. Did any responsible officer of this company know of this fraud, and as soon as he had knowledge of it or reasonable grounds to believe that the fraud and dishonesty had been committed, and, secondly, whether or not within ten days of that time the required notice was given to the company."

■ The jury returned a verdict for the plaintiff for $11,385, based upon the finding that Love had been guilty of embezzlement but that O'Brien had not been. Implicit in this charge is the finding that the defendant had received timely notice. The court, however, reserved decision on the question of notice, and later entered judgment for the defendant on the ground that it had not been notified within the required time. From this judgment the plaintiff appealed to this court.

■ The bond provides that the defendant be notified in writing "within ten days after discovery" of the default or any dishonest act by a person covered by the bond. This does not mean that it be notified in writing within ten days after the time that dishonesty was suspected but only after discovery of any default or any other dishonest act on the part of any person filling any position covered by the bond. Aetna Indemnity Co. v. J. R. Crow Coal & Mining Co., 154 F. 545 (C.C.A.8);

Aetna Indemnity Co. v. Farmers' National Bank, 169 F. 737 (C.C.A.3); National Surety Co. v. Western Pacific Ry. Co. 200 F. 675 (C.C.A.9); American Surety Company v. Pauly (No. 1), 170 U.S. 133, 18 S.Ct. 552, 42 L.Ed. 977.

■ There is a vast difference between mere or even real suspicion and positive discovery which justifies affirmative action. Love was president of the Casualty Company and was invested with very broad powers. No subordinate officer would have been justified in notifying the bonding company that the president had actually been guilty of any dishonest conduct until he had some positive proof of that fact. Gosline had his suspicions aroused by the transactions concerning the yacht the first week of September, and the semiannual audit a day or two thereafter. A careful and prudent person would have done just what he did, start an investigation, but, until that was completed and the investigation had established suspicions as facts, and it had become evident that Love would not or could not return the $17,500, as he had continuously promised to do, Gosline did not have sufficient reliable proof of Love's embezzlement to justify him in taking the final step of giving definite notice in writing that Love had embezzled the company's money. Gosline suspected that both Love and O'Brien were dishonest, but the finding of the jury as to O'Brien shows that one must exercise great care and have positive evidence of embezzlement before he makes a formal charge and gives notice thereof. If he had been mistaken as to Love as well as O'Brien, the result would have been serious both for Gosline and the Casualty Company. Some persons might have given notice before Gosline did and some might have done so later. Reasonably prudent men might differ as to when Gosline had sufficient facts to justify him in giving notice to the defendant. Under these circumstances the question of notice was properly submitted to the jury and its verdict should not have been disturbed. National Surety Co. v. Western Pacific Railway Co., supra.

The judgment is reversed and a new trial awarded.